Joseph SANFORD, Petitioner,

v.

John BURGE, Superintendent, Auburn Correctional Facility, Respondent.

No. CV 02–2930(NG)(MDG).

United States District Court, E.D. New York.

Sept. 2, 2004.

292

Joseph Sanford, pro se.

Queens County District Attorney's Office, by Donna Aldea, John M. Castellano, and Johnette Traill, for respondent.

## ORDER

GERSHON, District Judge.

Petitioner's objections, dated June 8, 2004, to the February 27, 2004 Report and Recommendation of the Honorable Marilyn D. Go, magistrate judge, have been reviewed under the *de novo* standard of review. *See* Fed.R.Civ.P. 72(b). The objections are without merit. Judge Go's thorough and thoughtful analysis of the issues before the court is hereby adopted by the court in its entirety. For the reasons stated by Judge Go, the petition for a writ of habeas corpus is denied.

Since petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability is denied pursuant to 28 U.S.C. § 2253(c).

**SO ORDERED.**

*REPORT AND RECOMMENDATION*

GO, United States Magistrate Judge.

Petitioner *pro se* Joseph Sanford seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition in this matter was referred to me by the Honorable Nina Gershon to report and recommend. For the following reasons, I recommend that the petition be denied.

*PROCEDURAL BACKGROUND*

Joseph Sanford was charged with two counts of attempted murder in the first degree, N.Y. Penal Law §§ 110.00, 125.27[1]; two counts of attempted murder in the second degree, *id.* §§ 110.00, 125.25[1]; one count of criminal possession of a weapon in the second degree, *id.* § 265.03; and one count of criminal possession of a weapon in the third degree, *id.* § 265.02[4]. After a jury trial before the Honorable Randall Eng, petitioner was convicted of two counts of attempted murder in the first degree and criminal possession in the second and third degrees. On September 4, 1996, Justice Eng sentenced petitioner to two consecutive indeterminate prison terms of fifteen years to life on the attempted murder convictions to run concurrently with two terms of imprisonment of five to fifteen years and two and 1/3 to seven years on the second and third degree weapon possession convictions, for a total term of imprisonment of thirty years to life.

*Wade Hearing*

Prior to trial, petitioner moved to suppress identification evidence. In his motion papers, petitioner specifically requested that "all persons who identified the defendant, or who were present at the procedure, but did not identify the defendant, be present at the hearing, so that they may be called as witnesses." Motion to Suppress Identification Evidence at 24

(attached as Exh. C to July 17, 2001 Application for Leave to Appeal to Court of Appeals).

The sole witness at the hearing was Detective Michael Solomeno, who was assigned to the 101st precinct and investigated a shooting in the vicinity of 443 Beach 54th Street, in Far Rockaway, Queens. Transcript of January 3, 5, 1996 Hearing ("H.") at 4–6. Arriving at the scene at about 12:15 a.m. on May 9, 1995, Solomeno learned from Sergeant Bonifati of the Queens Robbery Task Force that two of Bonifati's officers, Edward Wilkowski and Mark DiPierro, were involved in a shootout with two black males. *Id.* at 7. Shortly after the shooting incident, the officers told Bonifati that they were sitting in an unmarked car when two black men walked toward them, one of whom was carrying a gun. *Id.* Once the men passed the unmarked car, the officers exited the car, identified themselves as police officers and ordered the men to stop. In response, the armed man shot at the officers and the officers returned fire. *Id.* at 7–8. On cross-examination, Solomeno could not give the distance between the officers and the perpetrators when ordered to stop. *Id.* at 35–36, 38.

During the investigation of the shooting, Housing Unit officers canvassing the area interviewed a woman who knew petitioner and had seen him, while wearing a bandana, shooting into a housing project building at 5430 Beach Channel Drive on May 8. *Id.* at 12. Because petitioner fit the officers' description of the gunman, Solomeno prepared a photo array containing petitioner's photo. *Id.* Solomeno obtained the photographs for the photo array from "file cabinets full of" photos of people arrested at the 101st precinct. *Id.* at 41–42.

At about 8:45 a.m. on May 9, Solomeno spoke with DiPierro in the 101st precinct detective squad lunch room and showed

him a photo array containing petitioner's photo and five others. *Id.* at 8–10, 12–16. Solomeno then escorted DiPierro out and brought Wilkowski into the room to show him the same photo array. *Id.* at 9–11, 16–17, 42. Both officers' attorneys were present when Solomeno interviewed them. *Id.* at 32. Solomeno talked to each officer separately and DiPierro and Wilkowski did not talk to each other between the photo viewings. *Id.* at 16, 30. Both DiPierro and Wilkowski identified petitioner's photo as resembling the man who shot at them. *Id.* at 15–17. They told Solomeno that "they didn't get a good look" at the second man but described the gunman as a black male wearing a red bandana. *Id.* at 12, 18–19.

Solomeno neither created reports of his interviews of DiPierro and Wilkowski nor put the officers' description of the perpetrators in a "UF 61" form. *Id.* at 30–32. Solomeno had no prior contact with the officers and did not know whether they had been within the confines of the 101st precinct before. *Id.* at 29.

Although Solomeno separated the officers from each other when shown the photographs, Solomeno did not know whether the officers were separated from each other the whole time they were at the precinct. *Id.* at 42–43. Similarly, Solomeno did not know whether the officers talked to each other after the viewings. *Id.* at 48.

Petitioner was arrested at about 3:00 p.m. that afternoon in front of his apartment building. *Id.* at 18. Officers DiPierro and Wilkowski viewed a line-up at about 9:00 p.m. and both identified petitioner as the gunman from the night before. *Id.* at 19–26. Petitioner's number and position in the line-up were different for each officers' viewing. *Id.* at 21, 23. The five line-up fillers were men from a veteran's shelter in the 108th precinct who best fit petitioner's description. *Id.* at 20. Photographs

of both line-ups were admitted into evidence. *Id.* at 21–25. Solomeno admitted in cross-examination that he did not know whether the officers had previously seen the photographs used in the photo array or the men who were in the line-up. *Id.* at 45–46, 49–50. He also did not know whether the officers had ever previously set up photo arrays or line-ups in the 101st precinct. *Id.* at 45, 49–50.

At the conclusion of the hearing, defense counsel argued that Solomeno's testimony was insufficient because he did not know "whether these fillers used in the photo array and the lineup were ever used or seen by these two police officers, Wilkowski and DiPierro, before this incident." *Id.* at 53. Counsel further argued that "it's impossible for me to bring out a taint in this particular situation through this witness because the witness does not possess the knowledge …" and, accordingly, "one or both of these individual police officers have to be brought in to clear that up." *Id.* at 54–55.

The court denied the suppression motion, ruling that there was probable cause for petitioner's arrest and that although "all photo ID's and so on are susceptible of suggestibility," in this case "they were properly conducted." *Id.* The court also found, after examining the line-up photos, that there "was a fair line-up and the procedure … seemed to be fair." *Id.*

### Evidence at Trial

At midnight on the evening of May 8, 1995, Officers Wilkowski and DiPierro were in their unmarked police car parked on Beach 54th Street facing Beach Channel Drive with Alameda Avenue to the rear and with Wilkowski in the front passenger seat and DiPierro in the driver's seat. Trial Transcript ("Tr.") at 44–46. The car had tinted side and rear windows. *Id.* at 41, 774. Officer Wilkowski testified

that the lighting near the car was "dim," while Officer DiPierro testified it was "pretty well lit." *Id.* at 198, 780. The officers were conducting surveillance in an unrelated case when they saw petitioner and another man walking down the street towards them. *Id.* at 39, 48, 777. Wilkowski testified that the men were fifty to sixty feet away when he first saw them, while DiPierro stated that he first saw the men when they were twenty to thirty yards away. *Id.* at 48–49, 144–45, 777. When the men were about ten yards from the car, DiPierro observed petitioner holding what appeared to be a large silver forty-four caliber gun and alerted his partner.[1] *Id.* at 51, 779. Petitioner and his companion, who was unarmed, walked directly in front of the unmarked car, about six to eight feet from the officers, and crossed the street. *Id.* at 52, 780. With their shields exposed and guns drawn, the officers got out of their car and, as they approached the men from behind, DiPierro yelled "Police. Don't move." *Id.* at 58, 783. Petitioner, who was ten to fifteen feet away from the officers, turned and fired at them. *Id.* at 61–62, 783–84. Both officers fired back, but no one was injured. *Id.* at 63–66, 784–85.

In an ensuing chase, petitioner and his companion ran across a dirt and grass field towards the Edgemere housing project. Petitioner continued to shoot at the officers and the officers returned fire. *Id.* at 66–74, 785–87. During the chase, the perpetrators were twenty-five to sixty feet away from the officers. *Id.* at 70, 785–86. As petitioner and his companion reached the apartment houses, petitioner ran to the right and the other man continued straight ahead. The officers chased the unarmed

man but lost sight of him when he ran into a building. *Id.* at 72–74.

During the chase, DiPierro radioed a description of the gunman as a five feet six inch black man wearing a light bandana and a blue raincoat. *Id.* at 787–88. After more officers arrived at the scene, Wilkowski and DiPierro gave Sgt. Bonifati, their supervisor, descriptions of the two suspects. *Id.* at 76, 192–98, 788–89. At trial, they described the gunman as a black man, in his late teens, with a medium complexion, approximately five feet six inches tall, 130 pounds, wearing a red bandana and a red and blue three-quarter length rain jacket. *Id.* at 50, 53–55, 196–98, 778, 781–82, 787–88. They described the other suspect as a black man, also about 130 pounds, five feet six inches tall and wearing dark colored clothing. *Id.* at 50, 53–55, 196–98, 778, 781–82, 787–88.

Detective Sheptuck, a member of the crime scene unit who examined and diagramed the crime scene, found one forty-five caliber shell on the sidewalk of Beach 54th Street and five forty-five caliber shells in the dirt field. *Id.* at 641–54. Detective Kevin Barry, a ballistics expert, testified that these six shells had been fired from a forty-five caliber semiautomatic gun. *Id.* at 693–94. Twenty-seven nine millimeter discharged shells and one undischarged nine millimeter cartridge were also recovered from the scene. *Id.* at 641–55, 666. Examination of the shells revealed that one officer had fired fourteen shots, and the other had fired twelve. *Id.* at 692. No nine millimeter weapon was recovered. *Id.* at 747.

While investigating the shooting, detectives learned information that led them to arrest petitioner at 3:10 p.m. *Id.* at 710. That evening, Officers Wilkowski and Di-

---

**1.** DiPierro testified that he told Wilkowski that the suspect was carrying a gun when the men walked in front of their car. *Id.* at 782.

Pierro viewed a lineup and both officers independently identified petitioner as the shooter. *Id.* at 78–87, 713–20, 790–94. Both officers also identified petitioner at trial. *Id.* at 58–59, 778–779.

Detective Solomeno testified that Sgt. Bonifati prepared the UF–61 initial complaint report which listed the gunman as five feet four inches tall, although petitioner's height at the time of his arrest was five feet ten inches. *Id.* at 724–26, 731–38. Solomeno incorporated the five feet four inches description into the "unusual occurrence report" that he prepared. *Id.* at 732–35.

At the conclusion of both the prosecution's case and the defense, petitioner's counsel moved to dismiss the charges on the ground that the evidence was insufficient. *Id.* at 839–41. The court denied the motion to dismiss after the verdict was rendered. *Id.* at 976.

*Post–Verdict State Proceedings*

On October 12, 1999, petitioner filed a *pro se* motion to vacate the judgment of conviction pursuant to N.Y.Crim. Proc. Law §§ 440.10. On January 10, 2000, Justice Eng summarily denied the motion, holding that sufficient facts appeared on the record to have permitted an adequate review on direct appeal.

In February 2000, petitioner filed a brief appealing his conviction to the Appellate Division, Second Department raising the following claims:

1. The trial court violated petitioner's right to due process by denying his request to call the complaining witnesses to testify at the *Wade* hearing;

2. The evidence adduced at trial was insufficient to support petitioner's conviction and the jury's verdict was against the weight of the credible evidence; and

3. Petitioner's sentence was unduly harsh and excessive.

On May 29, 2001, the Appellate Division unanimously affirmed petitioner's conviction. *People v. Sanford,* 283 A.D.2d 660, 725 N.Y.S.2d 870 (2d Dep't 2001). Finding that petitioner had not preserved his challenge regarding the *Wade* hearing, the court ruled that, in any event, the claim was meritless. In addition, the Appellate Division held that the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt and the verdict was not against the weight of the evidence. Finally, the court found that petitioner's sentence was not excessive.

On June 25, 2001, petitioner sought leave to appeal to the Court of Appeals. On July 25, 2001, this application was denied. *People v. Sanford,* 96 N.Y.2d 907, 730 N.Y.S.2d 805, 756 N.E.2d 93 (2001).

*Habeas Petition*

In his habeas petition filed on May 4, 2002, Sanford raises two of the claims brought on direct appeal:

1. The trial court improperly denied petitioner's request to call the complaining witnesses at the *Wade* hearing violating his rights to due process; and

2. The evidence of petitioner's guilt was legally insufficient.

*DISCUSSION*

I. *Applicable Law for Habeas Review*

The writ of habeas corpus is available to any person held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Since this petition was filed after AEDPA's enactment, the provisions of AEDPA govern to the extent applicable. *See Williams v. Taylor,* 529 U.S. 362, 402–03, 120 S.Ct. 1495, 1518, 146 L.Ed.2d 389

(2000); *Boyette v. Lefevre,* 246 F.3d 76, 88 (2d Cir.2001).

### A. *Standard of Review*

AEDPA created a new standard of review intended to "place[ ] a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." *Williams,* 529 U.S. at 399, 120 S.Ct. 1495. A court reviewing a habeas petition under AEDPA may not grant a writ "with respect to any claim that was adjudicated on the merits in State court proceedings unless" the state court decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

 The two clauses of subsection (1) have "independent meaning." *Williams,* 529 U.S. at 364, 120 S.Ct. 1495. Under the first clause, a state court decision will be considered "contrary to" federal law if it either "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495 (O'Connor, J., concurring). "An unreasonable application of federal law is more than an incorrect application, but the petitioner need not show that all reasonable jurists would agree that a state court determination is incorrect in order for it to be unreasonable." *Yung v. Walker,* 341 F.3d 104, 109–10 (2d Cir.2003). Rather, a state court's interpretation of federal law should be examined using a standard of objective reasonableness. *See id.* at 110.

 Under the second clause, habeas relief may be granted if the state court decision "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams,* 529 U.S. at 407–08, 120 S.Ct. 1495. Whether a state decision is an "unreasonable application" of federal law must be based on an objective standard and relief may not be granted unless a relevant state court decision is both erroneous and unreasonable. *Id.* at 409, 411, 120 S.Ct. 1495.

In reviewing findings of fact under AEDPA, federal courts must assess whether the state court's determination was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Under this standard, a state court's determinations of fact shall be "presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

 A state court need not set forth the legal basis for resolution of federal claims in order for the broadly deferential standard set out in AEDPA to apply. *See Sellan v. Kuhlman,* 261 F.3d 303, 311–12 (2d Cir.2001). Rather:

> [T]he plain meaning of § 2254(d)(1) dictates [that for] the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer

to either the federal claim or to relevant federal case law.

*Sellan,* 261 F.3d at 312.

### B. *Adequate and Independent State Grounds*

■ A petitioner's failure to comply with state procedural rules may be a basis for precluding habeas review under the "adequate and independent" grounds doctrine. *See Coleman v. Thompson,* 501 U.S. 722, 726, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Harris v. Reed,* 489 U.S. 255, 261–63, 109 S.Ct. 1038, 1042–43, 103 L.Ed.2d 308 (1989); *Gonzalez v. Sullivan,* 934 F.2d 419, 421 (2d Cir.1991). This rule barring federal habeas courts from addressing the merits of procedurally defaulted claims arises out of principles of comity and the need for finality. *See McCleskey v. Zant,* 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).

■ However, a state court judgment will not constitute an adequate and independent state procedural ground unless the state court "clearly and expressly" states that the "judgment rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision." *Harris,* 489 U.S. at 260, 109 S.Ct. 1038 (citations omitted); *Epps v. Comm'r of Corr. Servs.,* 13 F.3d 615, 617 (2d Cir. 1994).

### II. *Wade Hearing Claim*

■ Respondent argues that petitioner's claim regarding the *Wade* hearing is procedurally barred because he failed to preserve the claim for appellate review and the Appellate Division rejected the claim on that basis, an adequate and independent state procedural ground. In affirming petitioner's judgment of conviction, the Appellate Division expressly ruled that his *Wade* hearing claim "is unpreserved

for appellate review and, in any event, without merit." *Sanford,* 283 A.D.2d at 660, 725 N.Y.S.2d 870. Although the state court opinion "clearly" and "expressly" states that the judgment rests on a state law ground that is "independent" of the merits of the federal claims, *see Glenn v. Bartlett,* 98 F.3d 721, 724–25 (2d Cir.1996), the state ground relied upon is not "adequate" to preclude federal habeas review in this case.

■ The Supreme Court has recognized that there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna,* 534 U.S. 362, 376, 122 S.Ct. 877, 885, 151 L.Ed.2d 820 (2002). A procedural bar will be deemed adequate only if it is based on a rule that is "firmly established and regularly followed in the specific circumstances presented in the case." *Cotto v. Herbert,* 331 F.3d 217, 240 (2d Cir.2003); *see Lee,* 534 U.S. at 386–87, 122 S.Ct. 877. In other words, "state courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims." *Garcia v. Lewis,* 188 F.3d 71, 77 (2d Cir.1999).

In determining the adequacy of a state ground, the Supreme Court has considered three factors: "1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; 2) whether state case law indicated that compliance with the rule was demanded in the special circumstances presented; and 3) whether petitioner had 'substantially complied' with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest." *Cotto,* 331 F.3d at 240; *see Lee,* 534 U.S. at

381–85, 122 S.Ct. 877. Only the third factor here is relevant since, as discussed below, petitioner clearly complied with the applicable procedural rule.

█ Although the Appellate Division does not explain the basis for its finding of procedural default, the court presumably relied on the contemporaneous objection rule codified in N.Y. C.P.L. § 470.05(2)[2] in finding petitioner's *Wade* hearing claim unpreserved.[3] The Second Circuit has held that C.P.L. § 470.05 ordinarily constitutes an adequate and independent state ground, *Garcia*, 188 F.3d at 79; *Bossett v. Walker*, 41 F.3d 825, 829 n. 2 (2d Cir. 1994), but will not bar federal habeas review of a claim that is "misapplied" in the specific circumstances of that case. *Cotto*, 331 F.3d at 240. Petitioner specifically requested in his suppression motion "that all persons who identified the defendant ... be present at the hearing, so that they may be called as witnesses." July 17, 2001 Criminal Leave Application, Exh. C at 24. Under New York law, a defendant's motion to suppress evidence preserves the specific issue raised in the motion. *People v. De Bour*, 40 N.Y.2d 210, 214, 352 N.E.2d 562, 386 N.Y.S.2d 375, 379 (1976) (suppression motion challenging search and seizure preserved issue on appeal);

see *People v. Purcelle*, 282 A.D.2d 824, 825, 725 N.Y.S.2d 106, 107 (3d Dep't 2001) (probable cause issue unpreserved where suppression motion did not allege illegality of arrest); *People v. Grant*, 184 A.D.2d 242, 243, 584 N.Y.S.2d 810, 811 (1st Dep't 1992) (defendant's failure to demand in suppression motion that prosecution produce sender of radio transmission leaves claim unpreserved for appellate review). Thus, under C.P.L. § 470.05 and the governing New York caselaw, petitioner preserved his habeas claim by raising the same issue in his suppression motion.

Moreover, defense counsel's argument at the *Wade* hearing also sufficiently preserved petitioner's claim for review. The Supreme Court has recognized that the contemporaneous objection rule rests on "the general principle that an objection which is ample and timely to bring the alleged federal error to the attention of the trial court and enable it to take appropriate corrective action is sufficient to serve legitimate state interests, and therefore sufficient to preserve the claim for review here." *Osborne v. Ohio*, 495 U.S. 103, 125, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). Similarly, the New York Court of Appeals has held that section 470.05 "require[s], at

**2.** New York's contemporaneous objection rule provides that:

[f]or purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same. Such protest need not be in the form of an "exception" but is sufficient if the party made his position with respect to the ruling or instruction known to the court, or if in response to a protest by a party, the court expressly decided the question raised on appeal. In addition, a party who without success has either expressly or

impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered.
C.P.L. § 470.05(2).

**3.** Respondent contended in its brief to the Appellate Division as follows: "At the hearing, defendant never requested that he be allowed to call the officers as witnesses; instead, he argued that the People had failed to meet their burden in the absence of the [o]fficers' testimony." Respondent's Appellate Brief ("Resp.App.Br.") at 12.

the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error." *People v. Luperon,* 85 N.Y.2d 71, 78, 623 N.Y.S.2d 735, 737–38, 647 N.E.2d 1243 (1995). In fact, section 470.05 provides that a party's "protest" is "sufficient" to preserve the issue if "the party made his position with respect to the ruling or instructions known to the court" by "either expressly or impliedly s[eeking] or request[ing] a particular ruling or instruction ... regardless of whether any actual protest thereto was registered." C.P.L. § 470.05.

Here, defense counsel argued at the suppression hearing that examination of the identifying witnesses was essential to determining whether their identification was unduly suggestive. Pursuing this point on cross-examination of the prosecution's only witness, Detective Solomeno, counsel established that Detective Solomeno did not know whether the officers had previously used the same fillers as those used either in the photo array or the line-up. H. at 45, 46, 50. Counsel urged that it was impossible to bring out a taint in the identification procedure through the prosecution's sole witness, arguing that "one or both of these individual police officers have to be brought in to clear that up." *Id.* at 55. Thus, the legal issue raised on appeal was "interjected at the fact-finding level in such a manner and at such a time as to fairly apprise the court and the opposing party of the nature and scope of the matter contested." *People v. Jones,* 81 A.D.2d 22, 41–42, 440 N.Y.S.2d 248, 261 (2d Dep't 1981); *see Luperon,* 85 N.Y.2d at 78, 623 N.Y.S.2d 735, 647 N.E.2d 1243. Counsel's conduct at the *Wade* hearing was "sufficient" under section 470.05 and the governing case law to put the hearing judge on notice that he wanted to examine the identifying witnesses and thereby preserve the issue for appeal. *See Cotto,* 331 F.3d at 244 (defendant made clear his position on the preclusion of cross-examination); *Garcia,* 188 F.3d at 80 (defendant "failed to put the trial judge on notice as to what the defendant now claims he wanted").

Finally, petitioner also satisfied section 470.05(2), since his counsel at the hearing "expressly or impliedly sought or requested a particular ruling or instruction" by arguing that "one or both of these individual police officers have to be brought in to clear" up the issues raised in Detective Solomeno's cross-examination. Counsel also contended that Detective Solomeno did not have the necessary knowledge to "answer the questions that would result in a taint," such as, whether the officers were familiar with the fillers Detective Solomeno used in the photo array and line-up. H. at 53–55. These statements are, at the very least, implied requests to confront the complaining witnesses. Thus, by explicitly and implicitly seeking at the suppression hearing to question the identifying officers, counsel preserved the issue for appeal. *Cotto,* 331 F.3d at 247 ("[C]ounsel's statement that it would be 'really totally completely unfair' to 'not allow me to cross-examine Mr. Echevarria on any or all of his background' constitutes an implied request to be allowed to cross-examine Echevarria'"). Since there is no requirement that counsel do more in the circumstances presented in this case, the Appellate Division's application of the contemporaneous objection rule under these facts is inadequate to preclude federal habeas review.

 Turning to the merits, petitioner asserts that the hearing court denied him due process by precluding testimony from the identifying officers at the *Wade* hearing. Due process requires the exclu-

sion of eyewitness testimony which is so unreliable as to create "a very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In determining whether identification testimony is admissible, a court must conduct a two-part sequential inquiry:

> The court must first determine whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator.... If the court finds ... that the procedures were suggestive, it must then determine whether the identification was nonetheless independently reliable.

*Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir.2001); *see Manson*, 432 U.S. at 114, 97 S.Ct. 2243; *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■ In federal habeas review, the question of whether an out-of-court identification procedure is so suggestive that it violates a defendant's due process rights is a mixed question of law and fact. *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). Under 28 U.S.C. § 2254(e), the findings of fact which underlie the state court's conclusion are entitled to the statutory presumption of correctness by the reviewing federal habeas court. Unless rebutted by clear and convincing evidence, the habeas court must accept the facts found by the state court as true. 28 U.S.C. § 2254(e)(1); *Overton v. Newton*, 295 F.3d 270, 277 (2d Cir.2002); *see also Mata*, 455 U.S. at 597 & n. 10, 102 S.Ct. 1303; *Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir.1986); *Nieves v. State of New York*, No. 97 CIV 2121(JGK), 1998 WL 599716, at *5 (S.D.N.Y. September 10, 1998).

At the *Wade* hearing, Detective Solomeno described the events leading up to the identification of petitioner, including the officers' separate viewings of the photo array, their separate viewings of the lineup, and the procedures utilized to ensure that the identification process was proper. At the conclusion of the hearing, and after examining the actual photo array and photographs of the two lineups that each officer viewed, the state judge found that the procedures used in the photo identifications and line-ups were not unduly suggestive. His findings regarding the persons depicted in the photographs of the line-ups are entitled to a presumption of correctness, as well as his implicit finding regarding the photographs used in the array. Indeed, defense counsel himself conceded that "the procedures used by ... the detective in this case were standard procedure," and that he was unable to show that they were unduly suggestive. H. at 53, 55.

■ Nevertheless, petitioner argues violation of his due process rights because the *Wade* hearing testimony of Detective Solomeno was insufficient to establish whether the identifying officers had previously seen the photos used in the photo array or the lineup fillers in past investigations. *See* Petitioner's Appellate Brief ("Pet.App.Br.") at 18. Petitioner also contends that the identifying witnesses were necessary to fill in gaps in Detective Solomeno's testimony as to what transpired between the officers between the time they viewed the photo array in the morning and the time they viewed the lineup in the evening. *Id.* However, petitioner's claim is based on pure speculation rather than a showing of some proof that the procedures were unduly suggestive. *See Byas v. Keane*, 97 Civ. 2798, 1999 WL 608787, at *13–*14 (S.D.N.Y. Aug. 12, 1999); *Rivalta v. Artuz*, No. 96 CIV 8043, 1997 WL 401819, at *3 (S.D.N.Y. July 16, 1997).

■ Moreover, New York law does not require an identifying witness to testify at a *Wade* hearing. *See People v.*

*Chipp,* 75 N.Y.2d 327, 336–39, 553 N.Y.S.2d 72, 77–79, 552 N.E.2d 608 (1990). Rather, an identifying witness's testimony is only required "if the hearing evidence raises substantial issues as to the constitutionality of the lineup, the resolution of which could not be properly resolved without testimony from the identification witness." *Id.* at 338, 553 N.Y.S.2d 72, 552 N.E.2d 608. Similarly, in habeas review, " '[a]n identifying witness may be required to testify only if substantial issues exist regarding the suggestiveness of the identification procedure which cannot be resolved without the witness' testimony.' " *Jamison v. Grier,* No. 01 CIV 6678, 2002 WL 100642, at *19 (S.D.N.Y. Jan. 25, 2002) (quoting *Byas,* 1999 WL 608787, at *13); *Heron v. People,* 98 Civ. 7941, 1999 WL 1125059, at *10 (S.D.N.Y. Dec. 8, 1999) ("Absent some proof that the line-up was unduly suggestive, a trial court may properly preclude an identifying witness from testifying"); *Sorenson v. Superintendent, Fishkill Correctional Facility,* No. 97 CV 3498, 1998 WL 474149, at *4 (E.D.N.Y. Aug. 7, 1998); *Rivalta,* 1997 WL 401819, at *3. Where a court does not find unduly suggestive procedures were used, "independent reliability is not a constitutionally required condition of admissibility, and the reliability of the identification is simply a question for the jury." *Jarrett,* 802 F.2d at 42 (citations omitted); *see also United States v. Wong,* 40 F.3d 1347, 1359 (2d Cir.1994); *Alvarez v. Keane,* 92 F.Supp.2d 137, 139 (E.D.N.Y.2000); *Sorenson,* 1998 WL 474149 at *5. Thus, the state court's refusal to permit defense counsel to examine the identifying witnesses before reaching the conclusion that the identification procedures used were not suggestive is neither contrary to nor an unreasonable application of established federal law.

▮ Moreover, both officers testified at trial regarding the conditions of the lineup, thereby affording petitioner the opportunity to examine the officers on the topics he wished to explore at the *Wade* hearing. Tr. at 78–84, 790–93, 797, 832–33. Even assuming that the state court should have granted counsel's request to question the identifying witnesses at the *Wade* hearing, his due process rights were not violated since he was given an opportunity to do so at trial. *See Jamison,* 2002 WL 100642, at *19; *Heron,* 1999 WL 1125059, at *9–*10; *Byas,* 1999 WL 608787, at *13; *Sorenson,* 1998 WL 474149, at *4; *Rivalta,* 1997 WL 401819, at *3; *see also Watkins v. Sowders,* 449 U.S. 341, 347–49, 101 S.Ct. 654, 658–59, 66 L.Ed.2d 549 (1981) (under due process clause, reliability of identification testimony can be sufficiently challenged through cross-examination and summation at trial rather than at *Wade* hearing); *Dunnigan v. Keane,* 137 F.3d 117, 129 (2d Cir.1998) ("Although it might have been preferable for the state court to hold a pretrial *Wade* hearing, we see no indication that the basis for [the eyewitness'] pretrial identification was not adequately explored . . . at trial").

▮ Indeed, even though petitioner did examine the identifying witnesses at trial regarding the issues he complains went unexplored at the *Wade* hearing, there is no evidence in the record to support his insinuation that the photo identification and lineup procedures were improper. *See Watkins,* 449 U.S. at 347–49, 101 S.Ct. 654 (cross-examination of eyewitnesses at trial is sufficient to test identification procedures in lieu of *Wade* hearing); *Dunnigan,* 137 F.3d at 129; *Chipp,* 75 N.Y.2d at 338–39, 553 N.Y.S.2d 72, 552 N.E.2d 608 ("[D]issent's concern that defendant was unfairly precluded from questioning the complainant about the possibility of suggestiveness at the *Wade* hearing overlooks the fact that defendant will be able to examine the witness and explore issues

relevant to identification at trial"). For example, on cross-examination, Officer DiPierro testified that prior to viewing petitioner's lineup, he had never prepared any lineup, let alone seen a lineup using the same fillers as those included in petitioner's lineup. Tr. at 833. Wilkowski testified that the only person he recognized in the lineup was the petitioner. *Id.* at 82–83. Moreover, neither officer was ever assigned to the 101st precinct nor is there any indication in the record that they could have seen the 101st precinct's BCI photos or fillers in the past.

In addition, both officers testified that they were at home when they were requested to return to the precinct to view a lineup. Tr. at 79, 832. Each officer also testified that he did not discuss the lineup before viewing it. *Id.* at 84, 791–92. Based on the testimony adduced at the hearing and at trial, petitioner has failed to raise any issue as to the suggestiveness of the identification procedures.

Since petitioner has failed to undermine the trial court's findings or demonstrate that the court unreasonably denied him the opportunity to call the identifying witnesses, this claim must be denied.

### III. *Sufficiency of Evidence*

Petitioner contends that the evidence presented at trial was not sufficient to prove his guilt beyond a reasonable doubt. Specifically, he challenges his identification and the government's version of the shooting, arguing that his conviction was based entirely on the eyewitness testimony of the two officers and that their testimony is unreliable. This Court's role is limited to considering whether the Appellate Division's rejection of petitioner's claim of legal insufficiency was contrary to, or unreasonably applied, clearly established Federal law. *See* 28 U.S.C. § 2254(d)(2).

Petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. *Einaugler v. Supreme Court of State of N.Y.,* 109 F.3d 836, 840 (2d Cir.1997); *Diaz v. Greiner,* 110 F.Supp.2d 225, 233 (S.D.N.Y.2000). A habeas court will not grant relief on a sufficiency claim unless the record is "so totally devoid of evidentiary support that a due process issue is raised." *Bossett,* 41 F.3d at 830. Where a petitioner claims that his guilt was not proven beyond a reasonable doubt, the relevant question for this court is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Court will "view the evidence in the light most favorable to the government," "construe all permissible inferences in its favor," and "resolve all issues of credibility in favor of the jury's verdict." *United States v. Reyes,* 157 F.3d 949, 955 (2d Cir.1998) (internal citations and quotation marks omitted); *see also Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996).

Here, petitioner has not met his burden of showing that no reasonable jury could have found that he attempted to kill Officers DiPierro and Wilkowski. Petitioner's argument rests largely on challenging the credibility of the officers and contending that their testimony was weighed too heavily. However, all issues of credibility are to be resolved in favor of the jury's verdict. *See Reyes,* 157 F.3d at 955; *Maldonado,* 86 F.3d at 35. On habeas review, courts "are not free to reassess the fact-specific credibility judgments by juries or to weigh conflicting testimony." *Huber v. Schriver,* 140 F.Supp.2d 265, 277 (E.D.N.Y.2001) (quoting *Vera v. Hanslmaier,* 928 F.Supp. 278, 284 (S.D.N.Y.

1996)) (internal quotation marks omitted). Thus, petitioner's challenge to the witnesses' credibility cannot support a claim of legal insufficiency on habeas review.

The record shows that both witnesses had ample opportunity to observe petitioner throughout the shooting incident and at close range. Both officers testified that they first saw petitioner when he was about sixty feet away and Officer DiPierro noticed that petitioner was holding a gun from about ten yards away. Tr. at 49, 51, 144–45, 777, 779. Petitioner continued to walk towards the officers until he was about six to eight feet directly in front of them. Id. at 52, 780. As the officers approached the men from behind, petitioner turned and fired at them from ten to fifteen feet away. Id. at 61, 784. The officers had a further opportunity to view the petitioner from about twenty-five to sixty feet away over the course of the ensuing chase. Id. at 70, 785–86. During the chase, Officer DiPierro radioed a description of the gunman as a five feet six inch black man, wearing a light bandana and a blue raincoat. Id. at 787–88. At the crime scene, the officers told their supervisor the gunman was a medium complexioned black man, in his late teens, who was approximately five feet six inches tall and 130 pounds, and wearing a red bandana and a red and blue three-quarter length rain jacket. Id. at 53–54, 781–82, 788.

Within twenty-four hours of the shooting, both officers independently identified petitioner from a line-up and later identified petitioner at trial. Id. at 58, 82–83, 778–79, 791. The lineup included five fillers, who resembled petitioner in height, weight, facial structure, race and skin color. Id. at 920. Petitioner selected his number for the first lineup and his number was changed for the second lineup. Id. at 715–717. Moreover, the officers were held in separate rooms prior to each's viewing of the lineup to avoid any contact between the two. Id. at 716. The officers' unequivocal identifications of petitioner were sufficient to permit a rational juror to find petitioner guilty beyond a reasonable doubt.

Petitioner claims that the officers' testimony was unreliable because they described the gunman as being five feet four inches or five feet six inches tall and without facial hair in contrast to petitioner who had light facial hair and was five feet ten inches tall. However, the officers denied providing a description of the gunman as five feet four inches. Id. at 196, 832. Despite defense counsel's attempt to pursue these points on cross-examination and in summation, the jury apparently resolved any discrepancies regarding the officers' descriptions and identification of petitioner in favor of the prosecution. "[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury" and this Court must "defer to the jury's assessments of both of these issues." Maldonado, 86 F.3d at 35. Here, the jury chose to believe the prosecution's witnesses despite the discrepancies in their testimony.

Since the evidence at trial was sufficient to permit a rational juror to find petitioner guilty beyond a reasonable doubt, the Appellate Division's decision as to the sufficiency of the evidence was not contrary to nor an unreasonable application of federal law. See, e.g., Huber, 140 F.Supp.2d at 276–77 (evidence legally sufficient despite discrepancies between eyewitness's description and petitioner's appearance); Manning v. Walker, No. 99 Civ. 5747(JG), 2001 WL 25637, at *5 (E.D.N.Y. Jan.3, 2001) (prosecution's evidence sufficient even though greatly dependent upon the identification testimony of one eyewitness).

*CONCLUSION*

For the foregoing reasons, I respectfully recommend that the petition be denied. As petitioner has not made a substantial showing of the denial of a constitutional right, I further recommend that this Court deny any application by petitioner for a certificate of appealability. *See Miller-El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

Copies of this report and recommendation have been mailed to respondent and sent federal express to petitioner. Objections to the Report and Recommendation must be filed with the Clerk of Court, with a copy to the undersigned, by March 19, 2004. Failure to file objections within the time specified waives the right to appeal. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).